UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA TAMPA
DIVISION

| | |
|---|---|
| BEVERLY MULVILLE;<br>RYAN JACK MULVILLE;<br>ELIZABETH MULVILLE;<br>ALLISON MULVILLE;<br>MINOR PLAINTIFF VGM;<br>MINOR PLAINTIFF ALM;<br>MINOR PLAINTIFF HLM;<br><br>        Plaintiffs,<br><br>    vs.<br><br>LIFELINK FOUNDATION, INC.; LIFELINK<br>FOUNDATION, INC. doing business as<br>LIFELINK OF GEORGIA; CRYOLIFE, INC.;<br>ROBBIE BLACK; and DOES 1-200 ;<br>inclusive,<br><br>        Defendants. | CASE NO. 8:18-cv-02779-TGW<br><br>AMENDED COMPLAINT FOR<br>COMPENSATORY, AND<br>PUNITIVE DAMAGES<br>PURSUANT TO COURT ORDER |

Plaintiffs, Beverly Mulville; Ryan Jack Mulville; Elizabeth Mulville; Allison Mulville; Minor Plaintiff VGM; Minor Plaintiff ALM; Minor Plaintiff HLM (collectively "Plaintiffs or the Family") hereby amend their prior complaint pursuant to court orders (Docs 35, 38), and re-file per clerk order of February 25, 2019:[1]

**GENERAL JURISDICTION**

1.     Plaintiff Beverly Mulville ("Beverly") was the lawfully married wife of Decedent Duane Mulville ("Duane"). Ryan Jack Mulville ("Jack"), Elizabeth Mulville ("ELIZABETH"), Allison Mulville ("Allison"), Minor Plaintiff VGM ("Minor VGM"), Minor Plaintiff ALM

---

1. This is the correct amended complaint. Larson in Florida at the time filed Doc 39 filed prematurely misunderstanding an email from Mr. Zelig and his staff in California who were still cleaning up the version filed and sent the amended draft after Larson who is still undergoing testing for her vertigo had fallen asleep. She then filed this version with a notice of errata as Doc. 40. On February 25, 2019 the clerk struck the filing of Doc. 39 because Larson had filed the first draft as an amended "document." This re-filing will be identical to Doc. 40 but for the modification of this footnote.

2. The full names of minor Plaintiffs VGM, ALM, and HLM, are obviously being withheld in the interests of the minors.

1

1  ("Minor ALM"), Minor Plaintiff HLM ("Minor HLM")[2] were the biological children of Duane.

2        2.     Defendants include Lifelink Foundation, Inc., Lifelink Foundation, Inc. doing

3  business as Lifelink of Georgia, (herein collectively Lifelink), Cryoife, Inc. (Cryolife); Robbie

   Black; and Does 1-200; inclusive, collectively referred to as Defendants.

4        3.     Venue is proper and this Court has jurisdiction over all of the named Defendants

5  because:

6        a)     Lifelink's corporate headquarters are located in Tampa, Florida;

7        b)     Lifelink's interactions with Plaintiffs described below included interactions in

8               Georgia and Florida;

9        c)     As set forth below, Plaintiffs engaged in numerous interactions with Lifelink's

10              Tampa, Florida office, including with Mr. Hock, who at the time was an officer, director,

                and managing agent of Lifelink, and resides in Florida;

11       d)     As set forth below, Plaintiffs are informed and believe and based thereon allege that

12              Cryolife, is an actual or ostensible partner and/or joint venturer of Lifelink;

13       e)     Cryolife is a Florida corporation organized and incorporated in Florida, has

14              significant contacts with Florida, and has an agent for process in Florida;

15       f)     Plaintiffs believe that Defendants improperly transported organs without

16              authorization from Georgia to Florida;

17       g)     The Lifelink defendants have stipulated to venue and process in this Court.

18       4.     Defendants, Does 1 through 200, inclusive, are unknown to Plaintiffs who therefore

   sue Does Defendants by such fictitious names and will ask leave of Court to amend this

19 Complaint to show the true names and capacities, whether corporate, individual, partnership,

20 association or otherwise, and said Defendants fault, tortious participation, and/or breach of

21 contract, statute and/or regulation upon discovery.

22       5.     Plaintiffs are informed and believe and based thereon allege that each of the

23 Defendants designated as Does 1 through 200, inclusive, are in some way responsible for the

24 injuries and damages sustained by Plaintiffs herein.

25       6.     At all relevant times, Teresa Armstrong, and Does 21-30 inclusive, (collectively

   "Armstrong") were agents, of Defendant Lifelink. All such acts and omissions are imputed to and

26 are the legal responsibility of Lifelink.

27       7.     At all relevant times, Danny Hawke, and Does 100-110 inclusive, (collectively

28

                                              2

"Hawke") were agents, of Lifelink. All such acts and omissions are imputed to and are the legal responsibility of Lifelink.

8.      At all relevant times, Daniel Schultz, and Does 110-120 inclusive, (collectively "Schultz") were agents, of Defendant Lifelink. All such acts and omissions are imputed to and are the legal responsibility of Lifelink.

9.      Plaintiffs are informed and believe and based thereon allege, at all times mentioned herein, that certain Defendants were the agents, principals, partners, associates, joint venturers, employees and/or co-conspirators of certain remaining co-defendants; that certain Defendants were at all times acting within the course, purpose and scope of said agency, partnership, association, joint venture employment and/or conspiracy and that certain Defendants were acting with the authorization, permission and/or consent of certain other co-Defendants.

## FACTUAL STATEMENT
### Thursday, June 15, 2017

10.      On Thursday, June 15, 2017, while at his home in Winder, Georgia, Duane suddenly passed. He was 48 years of age, very fit, a former professional baseball player, who up until his death had worked out regularly, and participated in an active lifestyle with his wife, Beverly. He was the biological father of Jack, Elizabeth, Allison, Minor VGM, Minor ALM, And Minor HLM.

11.      Duane and Beverly had been married for 28 years. When Beverly met Duane she knew right away "this is the man with whom I want to spend the rest of my life." They never missed an opportunity to say: "I love you." Duane had a generous and large personality. At the time of his death, Beverly and Duane had a business together of improving homes. He also ran a baseball school and was a licensed flooring contractor.

12.      Duane and Beverly shared equally in raising their 6 children. Duane participated in sport activities with his children, playing tennis and baseball. After retiring from pro-baseball, his career was physically demanding.

13.      At the time of Duane's passing: (1) Beverly was with Allison in Mobile, Alabama, for a tennis competition; (2) Duane was home with their other children in Winder, Georgia; and, (3) Duane may have had a driver's license issued by the State of North Carolina, but Plaintiffs are unable to confirm this since his license cannot be located.   (As more fully set forth below, Plaintiffs believe it was taken by the County Coroner for Barrow County, Robby Black.)

3

Complaint

14.     Duane had fallen asleep. Duane and Beverly's 8-year-old son heard "something" and noticed his dad was unresponsive. He ran to get his older sisters who attempted CPR.

15.     The children immediately called Beverly who was in Mobile, Alabama, and said: "Mom, Dad is dead." Beverly told her girls to call the EMT and wait for them to come to the house.   While Beverly was on the phone, she heard the EMTs arrive and their departure.

16.     The children followed the ambulance to the hospital.

17.     Beverly and Allison, numbed by shock and disbelief, threw their belongings into the family car, checked out of the hotel and rushed back to Winder. The trip home from Alabama took 7 hours.

18.     During the trip, Beverly tried to talk to a hospital agent, but no one would not talk to her. Beverly called Duane's good friend, Alon, a prominent thoracic surgeon, who contacted the hospital and spoke to its surgeon as the ER team attempted to resuscitate Duane. While she was still driving, Alon called Beverly and told her they could not revive Duane, and that he was pronounced dead at 2:05 a.m. During his discussions with Beverly, Alon advised Beverly an autopsy should be performed, in order to determine the actual cause of death, and that this would be important for the children.

19.     Beverly's and Duane's other children remained at the hospital until 3:00 a.m. when Lawson's Funeral Home retrieved Duane's body, and a friend came to pick the minor children up.

20.     While driving, following the unnerving prior calls, Beverly and Allison received a call from the County Coroner for Barrow County, Robby Black.   Plaintiffs are now informed and believe Black had a secret and illegal financial arrangement with Lifelink, where it would compensate Black to assist it in harvesting valuable organs.

21.     Black asked Beverly whether Duane was taking medications, and whether he smoked or drank alcohol. Beverly and Allison told Black that at the time of his death, Duane was in "great shape" and denied that Duane was taking medications or that he smoked or drank alcohol.   Black said because of Duane's apparent health and age there *would* be an autopsy.

22.     Within 30 minutes after Black's call, Beverly and Allison received another unnerving and unanticipated call from Armstrong, who identified herself as working for Lifelink of Georgia.

23.     Armstrong explained that she worked for a tissue donor facility and that Lifelink needed Beverly's authorization to harvest Duane's organs. Armstrong's statements and tone were

4

Complaint

clear, i.e., time was of essence and Lifelink could *not* proceed without Beverly's permission. Beverly told Armstrong that she would not consent at the time, that it would take some time to decide, and that she first wanted to discuss the issue with her older children.

24.     From her discussions with Alon, Beverly told Armstrong that it was her understanding that an autopsy and a study of various systems, including Duane's heart and cardiac system, had to be performed in order to determine if Duane suffered from any conditions that could be passed on, genetically or otherwise, to his children; and that she did not want the heart, connecting tissue and brain harvested because of this.

25.     Approximately 2 hours into her trip home, Black again contacted Beverly. Black made several statements at the time that unsettled Beverly. He told Beverly that he would not be performing an autopsy, after all, because the Georgia Bureau of Investigation (GBI) had advised him that no autopsy was required; and, that if she wanted one done, she would have to pay $5,000. He attempted to discourage Beverly from doing one and told her it was not necessary. Plaintiffs now believe that Black said these things to aid and abet Lifelink in obtaining valuable organs from Duane.

26.     After conferring with Alon, Beverly decided she would pay for a private autopsy.

27.     Within a few hours, while Beverly was still en route, Armstrong again contacted Beverly, who told Armstrong: (1) that she would be proceeding with a private autopsy, and (2) that her medical advisor told her not to give authorization for the removal of anything that would affect the validity of the autopsy, and any study of Duane's heart and related systems that could have caused or contributed to his death. Armstrong told Beverly and Allison that they would not harvest the organs the family needed for the autopsy.

28.     Armstrong, however, continued to pressure Beverly and Allison for authorization of a donation of bone, skin and eyes. Armstrong stated: "That was what Duane would have wanted." Beverly repeated that no decision would be made until she arrived home and discussed the issue with her older children.

29.   During the drive from the Coroner's office, Beverly had conversations with Mr. Lawson, the director of Lawson Funeral Home, who had retrieved Duane's body from the hospital. Beverly discussed the prior phone calls and her desire for an autopsy. Mr. Lawson recommended an independent forensic pathologist and made the arrangements therefore.

**Friday, June 16, 2017**

5

Complaint

30.     After arriving home, Beverly discussed the issue of the autopsy, and the harvesting of Duane's heart and related system with her older children. They agreed that they would only authorize the harvesting of eyes, tissue and bone. Beverly advised Lifelink and then Mr. Lawson of the family's limited donation.

31.     On Friday, June 16, 2017, at approximately 7:30 a.m., Beverly arrived at the hospital.

32.     Beverly and Mr. Lawson confirmed to Lifelink that it could retrieve Duane's body for the limited harvesting of eyes, tissue and bone; and, that upon returning the body to his funeral shop, Lawson would send the body to an independent pathologist in South Carolina for the autopsy.

33.     Beverly's brother, Brian, flew in from Ohio, and her son, co-Plaintiff, Jack, flew in from California. Duane's brother, Danny, flew in from Montana. Brian, and later Danny, together with Beverly and Elizabeth, traveled to the funeral home to view Duane's body and to make formal funeral arrangements before Mr. Lawson sent the body to South Carolina for an autopsy.

34.     Beverly and Mr. Lawson discussed the planned autopsy and its purpose, i.e. to study Duane's heart and the systems tied to the heart to determine whether the children had to worry about genetic or predisposition issues. Mr. Lawson excused himself to ensure the body was ready for viewing. Shortly thereafter, he returned, obviously stunned by a discovery. He told the family "I don't know how to tell you this, but Lifelink already harvested Duane's organs, including his heart".

35.     Mr. Lawson had been in business a long time. He stated that he had never seen anything like this.

36.     A tag was placed on Duane's foot that stated or indicated:

A.     "Lifelink of Georgia";

B.     "The family of Duane Mulville has graciously requested the donation of organs/and or tissues for transplantation. …The following tissues have been recovered: Heart for valves, skin, bone, saphenous veins";

C.     In handwritten notes: "For pending autopsy. DeKalb ME."

D.     There were form questions for the examiner to complete for the purpose to evaluate whether the organs were suitable;

E.     Blood samples were marked off;

6

Complaint

F.    There was no mark for the eyes.

37.    Hence, Lifelink took the heart; but it did not take the eyes. This was the exact opposite of what Duane's family had authorized.

38.    The family, aghast at the news, sat while Mr. Lawson contacted Lifelink for an explanation.

39.    Mr. Lawson, Beverly, and her family by her side, advised that Lifelink knew that the family had not consented to the harvesting of Duane's heart and wanted it returned immediately. Lifelink's representative was unapologetic, unsympathetically proclaiming that consent and an autopsy, were not needed.

**Saturday and Sunday – June 17th and 18th, 2017**

40.    For the next two days, Beverly, with the assistance of another friend, attempted to contact directors and supervisors for Lifelink, in order to receive an explanation of what had happened, and to receive a commitment that the heart would be returned.

41.    These contacts included phone calls and correspondence between Beverly, her attorney and Lifelink representatives.   Beverly waited in anguish for promised return calls, which were not returned.   Beverly and her friend sent an email advising that the family had not authorized the harvesting of the organs taken, and demanded the return of the heart, and preservation of Duane's file.

42.    None of the efforts succeeded. Lifelink did not provide: (1) an explanation of what had occurred; (2) an explanation about whether the harvesting of Duane's heart had occurred intentionally or by mistake; (3) the location of the heart, or (4) a commitment for the return of the heart. This exacerbated Plaintiffs' distress and grief.

43.    Plaintiffs believe that Lifelink works with another entity, i.e., co-defendant Cyrolife, that stores the organs and tissues.

**June 20, 2017**

44.    On June 20, 2017, Cryolife completed an alleged analysis, triggering the "90-day" period within which, as Beverly later learned, it would maintain Duane's heart before discarding it.   However, Lifelink did not send a notice to Beverly until July 28, 2017. In that communication, it advised that Duane's heart was being stored by its partner, Cryolife.

45.    Beverly contacted Cryolife to make arrangements to pick-up the heart. Adding to her grief and anguish, after several attempts to talk to a manager, she was advised by a member of

7

Cyrolife's "Donation Support Team" that Cryolife did not have the heart, that Cryolife did not store any body parts, Lifelink or the coroner possessed the heart, and that this should have been explained to her by Lifelink. These events exacerbated Beverly's and her children's grief and emotional distress at a vulnerable time.

46.     Beverly then contacted the coroner to obtain possession of the heart. Black advised Beverly that Duane's heart valves had been harvested and would not be returned. Beverly was stunned, perplexed and overwhelmed by the news.

47.     Beverly, and each of her children, had at least a quasi-property interest in Duane's remains and his organs, and had the right to insist that his remains not be defiled. Defendants, as purportedly experienced organ donor facilitators, should have conducted themselves within applicable standards, but did not do so.

48.     Subsequently, a long- time friend, father-figure to Duane, and former police officer, contacted GBI relative to issues surrounding Duane's death. In response to his inquiry as to why no autopsy had been authorized by the Black, he was advised that GBI was told (presumably by Black) that no autopsy was required because Duane was "morbidly obese," even though he was in excellent physical shape.

49.     Six months later GBI conducted a limited autopsy on Duane's remains (which did not include his heart and related organs and systems). The report noted, *inter alia*:

A.     That Duane only demonstrated 60% artery blockage, which it described as "moderate" atherosclerosis,

B.     That: "(b)ased on the circumstances surrounding the death, the autopsy findings, and the toxicology results, the death was most likely caused by heart disease. Duane Mulville was one of the small percentage of people with no significant medical history who die suddenly and unexpectedly from what appears to be natural disease, with the subsequent autopsy revealing no clear cause of death. …Autopsy revealed some heart disease consisting of moderate coronary artery atherosclerosis and microscopic evidence of mild heart enlargement. While these findings were not of sufficient severity to normally be expected to have caused the death, these may have caused or contributed to the death given the absence of other findings to explain the death."

50.     Hence, as set forth above and below, at all relevant times, and as any normal human

8

being could understand, even before Defendants permanently injected themselves into Plaintiffs' lives, Plaintiffs, and Beverly in particular, had their hands full emotionally and economically. Defendants conduct was malicious, wilful or wanton resulting in substantial and enduring emotional distress upon the Plaintiffs.

51.     As set forth in incorporated paragraphs, with wilful intention to inflict injury on Plaintiffs, and/or with a reckless disregard for the rights of Plaintiffs, Defendant intentionally did not comply with Plaintiffs' express wishes for the disposal of Duane's body.

**Plaintiffs Reserve the Right To Bring Cause Of Action For Violation Of RICO, and Related Causes of Action**

52.     At this time, Plaintiffs elect not to amend the RICO cause of action, and related causes of action, such as OCGA § 9–11–15(c) (Georgia Unfair Business Practice Act), and do so without prejudice.   However, should the discovery process result in evidence that would permit an amendment within the parameters of *Ray v. Spirit Airlines, Inc.,* 836 F.3d 1340, 1349 (11th Cir. 2016), and case law for OCGA § 9–11–15(c), Plaintiffs will seek leave to amend.

# FIRST CAUSE OF ACTION - NEGLIGENT INTERFERENCE WITH REMAINS AND MISHANDLING OF A CORPSE

(By all plaintiffs against all Defendants.)

53.     Plaintiffs incorporate paragraphs 1 - 52, inclusive, as though fully set forth herein.

54.     Under Georgia law there exists a legal duty, *enforceable by the next of kin,* which requires that a party contractually obligated to handle a corpse, do so non-negligently, and with utmost dignity."

55.     Plaintiffs under Georgia law each had a personal, quasi-property right in Duane's body to ensure its proper handling and burial.

56.     Defendants actively sought Plaintiffs' permission to take Duane's body for the harvesting of certain organs, i.e. eyes, bone and tissue.

57.     Under Georgia law, there exists a legal duty, *enforceable by the next of kin,* which requires that a party contractually obligated to handle a corpse, do so non-negligently and with utmost dignity.

58.     Defendants understood Plaintiffs wanted Duane's body, with his heart, brain, valves intact for a proper autopsy in order to determine the actual cause of death and any genetic

9

predisposition to premature death. This knowledge was important to his biological children and Beverly.

59.     Defendants agreed: (1) that they would not harvest organs the family wanted for the autopsy because they did not know the cause of death and could not take them without Beverly's consent; and (2) that Defendants would return the body for the family to carry out their expressed wishes including for a complete autopsy.

60.     There are accepted standards of care for tissue donor facilities in the harvesting of organs including but not limited to: (1) that they will not interfere with the conduct of a proper autopsy; and, (2) that they will respectfully interact with the family members of the deceased.

61.     The Defendants had a reasonable opportunity to comply with Plaintiffs' expressed wishes in compliance with these standards, but failed to do so in order to further their own pecuniary interests.

62.     Defendants failed to exercise the appropriate level of care, skill, and diligence for tissue donor facilities, harvesters, and coroners. These failures resulted in their mishandling of Duane's body and harvesting of his organs, and among other things, nullified the ability of the family to conduct an autopsy to determine the actual cause of Duane's death, which would have benefitted his biological children and his spouse.

63.     These failures resulted and will result in pain and suffering, emotional distress and as to the children, extraordinary medical expenses and other damages.

### SECOND INTENTIONAL INFLICTION OF
### EMOTIONAL DISTRESS

(By all plaintiffs against all Defendants.)

64.     Plaintiffs hereby incorporate paragraphs 1 - 52, inclusive, as though fully set forth herein.

65.     The Defendants actively sought Plaintiffs' permission to take Duane's body for the harvesting of certain organs, i.e. eyes, bone and tissue.

66.      Under Georgia law there exists a legal duty, *enforceable by the next of kin,* which requires that a party contractually obligated to handle a corpse, do so non-negligently, and with utmost dignity."

67.     Defendants understood Plaintiffs wanted Duane's body for an autopsy in order to

10

Complaint

determine the actual cause of death and that this was important to his biological children.

68.     Defendants agreed: (1) that they would not harvest organs the family wanted for the autopsy because they did not know the cause of death and could not take them without Beverly's consent; and (2) that Defendants would return the body for the family to carry out their expressed wishes including for an autopsy.

69.     Beverly and Mr. Lawson confirmed to Lifelink that it could retrieve Duane's body for the limited harvesting of eyes, tissue and bone, and, that upon returning the body to his funeral shop, Lawson would send the body to an independent pathologist in South Carolina for the autopsy.

70.     Beverly's brother, Brian, flew in from Ohio, and her son, co-Plaintiff, Jack, flew in from California. Duane's brother, Danny, flew in from Montana. Brian, and later Danny, together with Beverly and Elizabeth, traveled to the funeral home to view Duane's body and to make formal funeral arrangements before Mr. Lawson sent the body to South Carolina for an autopsy.

71.     Beverly and Mr. Lawson discussed the planned autopsy and its purpose, i.e. to study Duane's heart and the systems tied to the heart to determine whether the children had to worry about genetic or predisposition issues. Mr. Lawson excused himself to ensure the body was ready for viewing. Shortly thereafter, he returned, obviously stunned by a discovery. He told the family "I don't know how to tell you this, but Lifelink already harvested Duane's organs, including his heart".

72.     A tag was placed on Duane's foot that stated or indicated:

A.     "Lifelink of Georgia";

B.     "The family of Duane Mulville has graciously requested the donation of organs/and or tissues for transplantation. ...The following tissues have been recovered: Heart for valves, skin, bone, saphenous veins";

C.     In handwritten notes: "For pending autopsy. DeKalb ME."

D.     There were form questions for the examiner to complete for the purpose to evaluate whether the organs were suitable;

E.     Blood samples were marked off;

F.     There was no mark for the eyes.

73.     Hence, Lifelink took the heart; but it did not take the eyes. This was the exact opposite of what Duane's family had authorized.

11

Complaint

74.   The family, shaken by this numbing news at a most excruciating time of their lives looked to Mr. Lawson to explain the inexplicable.

75.   Lawson has been in business a long time. He said that he had never seen anything like what had occurred, adding to the family's horror and outrage.

76.   Mr. Lawson, Beverly, and her family by her side, immediately contacted Lifelink re-asserting that Lifelink knew prior to receiving Duane's body, that the family had not consented to the harvesting of Duane's heart and wanted it returned immediately. Lifelink's representative was unapologetic, unsympathetically proclaiming that consent and an autopsy, were not needed. This outraged, devastated and confused Beverly and her family who had gone through a painful process to give the permission Lifelink had sought and now told was unnecessary.

77.   For the next two days, Beverly, with the assistance of another friend, attempted to contact directors and supervisors for Lifelink, in order to receive an explanation of what had happened, and to receive a commitment that the heart would be returned.

78.   These contacts included phone calls and correspondence between Beverly, her attorney and Lifelink representatives. Beverly waited in anguish for promised return calls, which were not returned. Beverly and her friend sent an email advising that the family had not authorized the harvesting of the organs taken, and demanded the return of the heart, and preservation of Duane's file.

79.   None of the efforts succeeded. Lifelink did not provide: (1) an explanation of what had occurred; (2) an explanation about whether the harvesting of Duane's heart had occurred intentionally or by mistake; (3) the location of the heart, or (4) a commitment for the return of the heart. This exacerbated Plaintiffs' distress, grief and trauma.

80.   These events and other events described above exacerbated Beverly and her children's crushing grief and bafflement at a vulnerable time.

81.   Beverly then contacted the coroner to obtain possession of the heart. Black advised Beverly that Duane's heart valves had been harvested and would not be returned, further devasting the family.

82.   Subsequently, a long- time friend, father-figure to Duane, and former police officer, contacted GBI relative to issues surrounding Duane's death. In response to his inquiry as to why no autopsy had been authorized by the Black, he was advised that GBI was told (presumably by Black) that no autopsy was required because Duane was "morbidly obese," even though he was in

12

excellent physical shape and Black had told the family the complete opposite. This news appalled an already traumatized family.

83.     As set forth in incorporated paragraphs, with wilful intention to inflict injury on Plaintiffs, and/or with a reckless disregard for the rights of Plaintiffs, Defendant intentionally did not comply with Plaintiffs' express wishes for the disposal of Duane's body to their outrage.

84.     At all relevant times, and as any normal human being could understand, even before Defendants permanently injected themselves into Plaintiffs' lives, Plaintiffs, and Beverly in particular, had their hands full emotionally and economically. Defendants conduct was outrageous, malicious, wilful or wanton resulting in substantial and enduring emotional distress upon the Plaintiffs and any person in similar situation would see the conduct as such

85.     As a proximate result, Plaintiffs suffered substantial general and non-economic losses.

86.     Defendants acted with malice, oppression, and fraud, and therefore are liable to Plaintiffs for punitive damages.

## THIRD CAUSE OF ACTION – INTENTIONAL INTERFERENCE WITH REMAINS AND MISHANDLING OF A CORPSE

87.     Plaintiffs incorporate paragraphs 1 - 52, inclusive, as though fully set forth herein.

88.     Plaintiffs under Georgia law each had a personal, quasi-property right in Duane's body to ensure its proper handling and burial.

89.     There is an issue as to whether Duane had authorized the harvesting of his organs.

90.     The Defendants actively sought Plaintiffs' permission to take Duane's body for the harvesting of certain organs, i.e. eyes, bone and tissue.

91.     Under Georgia law there exists a "legal duty, *enforceable by the next of kin,* which requires that a party contractually obligated to handle a corpse, do so non-negligently, and with utmost dignity."

92.     Defendants understood Plaintiffs wanted Duane's body for an autopsy in order to determine the actual cause of death and that this knowledge was important to his biological children and their mother.

93.     Defendants agreed: (1) that they would not harvest organs the family wanted for the autopsy because they did not know the cause of death and could not take them without Beverly's consent; and (2) that Defendants would return the body for the family to carry out their expressed

13

Complaint

wishes.

94.     Beverly and Mr. Lawson confirmed to Lifelink that it could retrieve Duane's body for the limited harvesting of eyes, tissue and bone; and, that upon returning the body to his funeral shop, Lawson would send the body to an independent pathologist in South Carolina for the autopsy.

95.     Beverly's brother, Brian, flew in from Ohio, and her son, co-Plaintiff, Jack, flew in from California. Duane's brother, Danny, flew in from Montana. Brian, and later Danny, together with Beverly and Elizabeth, traveled to the funeral home to view Duane's body and to make formal funeral arrangements before Mr. Lawson sent the body to South Carolina for an autopsy.

96.     Beverly and Mr. Lawson discussed the planned autopsy and its purpose, i.e. to study Duane's heart and the systems tied to the heart to determine whether the children had to worry about genetic or predisposition issues. Mr. Lawson excused himself to ensure the body was ready for viewing.   Shortly thereafter, he returned, obviously stunned by a discovery. He told the family "I don't know how to tell you this, but Lifelink already harvested Duane's organs, including his heart".

97.     A tag was placed on Duane's foot that stated or indicated:

A.     "Lifelink of Georgia";

B.     "The family of Duane Mulville has graciously requested the donation of organs/and or tissues for transplantation. …The following tissues have been recovered: Heart for valves, skin, bone, saphenous veins";

C.     In handwritten notes: "For pending autopsy. DeKalb ME."

D.     There were form questions for the examiner to complete for the purpose to evaluate whether the organs were suitable;

E.     Blood samples were marked off;

F.     There was no mark for the eyes.

98.     Hence, Lifelink took the heart; but it did not take the eyes. This was the exact opposite of what Duane's family had authorized.

99.     The family, shaken by this numbing news at a most excruciating time of their lives looked to Mr. Lawson to explain the inexplicable.

100.   Lawson has been in business a long time. He said that he had never seen anything like what had occurred, adding to the family's horror and outrage.

14

101.    Mr. Lawson, Beverly, and her family by her side, contacted Lifelink and told Lifelink that it had known prior to their retrieval of Duane's body from his business that the family had not consented to the harvesting of Duane's heart and wanted it returned immediately. Lifelink's representative was unapologetic, unsympathetically proclaiming that consent and an autopsy, were not needed. This outraged, devastated and confused Beverly and her family who had gone through a painful process to give the permission Lifelink had sought and now told was unnecessary.

102.    For the next two days, Beverly, with the assistance of another friend, attempted to contact directors and supervisors for Lifelink, in order to receive an explanation of what had happened, and to receive a commitment that the heart would be returned.

103.    These contacts included phone calls and correspondence between Beverly, her attorney and Lifelink representatives. Beverly waited in anguish for promised return calls, which were not returned. Beverly and her friend sent an email advising that the family had not authorized the harvesting of the organs taken, and demanded the return of the heart, and preservation of Duane's file.

104.    None of the efforts succeeded. Lifelink did not provide: (1) an explanation of what had occurred; (2) an explanation about whether the harvesting of Duane's heart had occurred intentionally or by mistake; (3) the location of the heart, or (4) a commitment for the return of the heart. This exacerbated Plaintiffs' distress and grief.

105.    Beverly then contacted the coroner to obtain possession of the heart. Black advised Beverly that Duane's heart valves had been harvested and would not be returned.

106.    Subsequently, a long- time friend, father-figure to Duane, and former police officer, contacted GBI relative to issues surrounding Duane's death. In response to his inquiry as to why no autopsy had been authorized by the Black, he was advised that GBI was told (presumably by Black) that no autopsy was required because Duane was "morbidly obese," even though he was in excellent physical shape.

107.    The Defendants failed to comply with Plaintiffs' clear and express wishes and directives in direct violation of their obligations to the Plaintiffs under Georgia law and in the process failed to handle Duane's body with the care and respect they owed.

108.    Defendants' conduct resulted in their mishandling and defiling of Duane's body, and the family being deprived of the ability to conduct a proper autopsy to explore Duane's cause

15

of death for the benefit of his children and spouse. This resulted in, and will result in the plaintiffs' sustention of unnecessary pain and suffering, emotional distress and, as to the children, extraordinary medical monitoring expenses and other damages.

### FOURTH CAUSE OF ACTION – BREACH OF CONTRACT

#### (By all Plaintiffs against all Defendants.)

109.    Plaintiffs incorporate paragraphs 1 - 52, inclusive, as though fully set forth herein.

110.    Plaintiffs under Georgia law each had a personal, quasi-property right in Duane's body to ensure its proper handling and burial.

111.    There is an issue as to whether Duane had authorized the harvesting of his organs.

112.    The Defendants actively sought Plaintiffs' permission to take Duane's body for the harvesting of certain organs, i.e. eyes, bone and tissue.

113.    Under Georgia law here exists a "legal duty, *enforceable by the next of kin,* which requires that a party contractually obligated to handle a corpse, do so non-negligently and with utmost dignity."

114.    Defendants understood Plaintiffs wanted Duane's body for an autopsy in order to determine the actual cause of death and that this knowledge was important to his biological children.

115.    Defendants entered into an express agreement with the Plaintiffs to handle Duane's body. More specifically, Defendants agreed to various things, including but not limited to: (1) that they would not harvest organs which needed to be intact for the autopsy; and (2) that Defendants would return the body for the family to carry out their expressed wishes.

116.    Defendants confirmed to Plaintiffs and Mr. Lawson that they would engage in a limited harvest of Duane's body, i.e., a harvest limited to eyes, tissue and bone; and, would return the body to the Lawson Funeral Home so that the family could make funeral arrangements and have Lawson send the body to an independent pathologist in South Carolina for autopsy.

117.    Beverly's brother, Brian, flew in from Ohio, and her son, co-Plaintiff, Jack, flew in from California. Duane's brother, Danny, flew in from Montana. Brian, and later Danny, together with Beverly and Elizabeth, traveled to the funeral home to view Duane's body and to make formal funeral arrangements before Mr. Lawson sent the body to South Carolina for an autopsy.

118.    Beverly and Mr. Lawson discussed the planned autopsy and its purpose, i.e. to study Duane's heart and the systems tied to the heart to determine whether the children had to

16

Complaint

worry about genetic or predisposition issues. Mr. Lawson excused himself to ensure the body was ready for viewing.   Shortly thereafter, he returned, obviously stunned by a discovery. He told the family "I don't know how to tell you this, but Lifelink already harvested Duane's organs, including his heart".

119.   A tag was placed on Duane's foot that stated or indicated:

A.   "Lifelink of Georgia";

B.   "The family of Duane Mulville has graciously requested the donation of organs/and or tissues for transplantation. …The following tissues have been recovered: Heart for valves, skin, bone, saphenous veins";

C.   In handwritten notes: "For pending autopsy. DeKalb ME."

D.   There were form questions for the examiner to complete for the purpose to evaluate whether the organs were suitable;

E.   Blood samples were marked off;

F.   There was no mark for the eyes.

120.   Hence, Lifelink took the heart; but it did not take the eyes. This was the exact opposite of what Duane's family had authorized.

121.   Lawson has been in business a long time. He said that he had never seen anything like that.

122.   The Defendants failed to comply with their agreement with Plaintiffs.

123.   This breach resulted and will result in continuing economic and non- economic damages including extraordinary medical expenses and pain and suffering.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   For compensatory, general, consequential, and incidental damages, in an amount of $5,000,000 per Plaintiff, or other amount in the reasonable discretion of the trier of fact;

2.   For pre-judgment and/or post-judgment interest at the legal rate;

3.   For exemplary/punitive damages

4.   For restitution;

11.   For return of DUANE's heart;

12.   For attorney fees;

17

Complaint

13.   For costs of suit;

14.   For such other further relief that the Court may deem just and proper.

s/Larson

_____

Karen Larson, Local Counsel
Florida Bar No. 0765686
Primary E-mail: Karen.a.larson@gmail.com
Century Law Group
751 Orchid Court
Marco Island Florida   34145
Tel.: 239-259-0738


s/Zelig

_____

Steven Zelig (State Bar No. 94654)
**WLA LEGAL SERVICES, Inc.**
1543 7th St 3rd Floor
Santa Monica, CA 90401
Telephone: (310) 393-6702 Facsimile: (310) 393-6703
slz@brentwoodls.com


### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

s/Larson

_____

Karen Larson, Local Counsel
Florida Bar No. 0765686
Primary E-mail: Karen.a.larson@gmail.com
Century Law Group
751 Orchid Court
Marco Island Florida   34145
Tel.: 239-259-0738

18

Complaint

1

2

3

s/Zelig

_____

4

5

Steven Zelig (State Bar No. 94654)

**WLA LEGAL SERVICES, Inc.**

6

1543 7th St 3rd Floor

Santa Monica, CA 90401

7

Telephone: (310) 393-6702 Facsimile: (310) 393-6703

8

slz@brentwoodls.com

9

10

11

## CERTIFICATE OF SERVICE

12

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically

13

filed by CM/ECF electronic filing which will send a notice of electronic filing and copy to the

14

parties counsel of record:   Richard  M.  Hanchett,  Esquire,   rhanchett@trenam.com;

15

achrisman@trenam.com,   Brigid   A.   Merenda,   Esquire,   bmerenda@trenam.com;

16

ranctil@trenam.com; and Anne C. Leonard, Esquire, aleonard@trenam.com; jamer@trenam.com of

17

TRENAM, KEMKER, SCHARF, BARKIN, FRYE, O'NEILL & MULLIS, P.A., 101 East Kennedy

Boulevard, Suite 2700, Post Office Box 1102, Tampa, Florida   33601.

18

19

s/Larson

20

_____

21

Karen Larson, Local Counsel

Florida Bar No. 0765686

22

Primary E-mail: Karen.a.larson@gmail.com

Century Law Group

23

751 Orchid Court

24

Marco Island Florida   34145

Tel.: 239-259-0738

25

26

27

28

19

Complaint